(35 South. 283.)

No. 14,663.

PLEASANTS et al. v. CITY OF SHREVEPORT et al.*

(April 13, 1903.)

MUNICIPAL CORPORATIONS—UNLAWFUL PAYMENTS—ACTION BY TAXPAYER—PAVING CONTRACT—DEFECTIVE WORK.

1. As any taxpayer may interfere to prevent a municipal corporation from paying money from the public treasury without consideration, a fortiori can particular taxpayers interfere to prevent the recognition of an illegal claim, the obligation to pay the greater portion of which will otherwise be imposed upon them.

2. Front proprietors, who are threatened with liability for paving under a contract entered into by a municipal corporation agreeably to the provisions of Act No. 10, p. 9, of 1896, have a standing in court to prevent the acceptance of the work, the payment of the corporation's proportion of the cost, and the issuance of certifi-

*Rehearing denied November 16, 1903.

cates for the proportion said to be due by them, where there has been fraud in its execution, and the work falls short of the requirements of the contract, though the officers of the corporation be not parties to the fraud.

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Alfred Dillingham Land, Judge.

Action by W. A. Pleasants and others against the city of Shreveport and others. Judgment for defendants, and plaintiffs appeal. Reversed.

Sutherlin & Barrett, for appellants. Ruffin Golson Pleasant and Edward Hughes Randolph, for appellee city of Shreveport. William Henry Wise and Edward Beverly Herndon, for appellee Nelson Paving Co.

### Statement of the Case.

MONROE, J. The plaintiffs, as citizens and taxpayers of Shreveport, and as owners of real estate on Sprague street, in that city, seek to prevent the corporate authorities from accepting, and from paying and issuing certificates for, certain paving work which has been done in front of their (plaintiffs') property by the Nelson Paving Company, upon the grounds, as alleged by them, that the work has not been done in accordance with the contract between the city and the paving company, in that the rock, sand, and cement used in making the concrete upon which the asphalt surface of the pavement is laid are not such as, and are not mixed in the proportions, required by said contract; that the asphalt is not of the quality required, and that the pavement, as laid, is of no value, and hence that for the city to accept it and pay its proportion, and impose upon petitioners the obligation of paying their proportion (amounting to two-thirds), of the contract price, would be a misappropriation of public funds, and a fraud upon petitioners' rights. They therefore pray that the city and the officers charged with those functions be enjoined from so doing. And a preliminary injunction was accordingly issued.

The city and the officers mentioned, by way of exception, aver that the petition discloses no cause of action, and that the plaintiffs are estopped by reason of their silence and inaction whilst the work complained of

was being done; and for answer they deny the allegations of the petition, and aver that the said work has been done in accordance with the contract between the city and the contractor; and the contractor, the Nelson Paving Company, intervening, adopts the exceptions and defense thus set up.

The case presented by the evidence in the record is as follows:

The city of Shreveport made a valid contract with the Nelson Paving Company for the paving of Sprague street from Western avenue to Common street, a distance of some eight squares, or, say 10,527 yards, at $2.19 per square yard. By the terms of the law (Act No. 10, p. 9, of 1896) under which the contract was made the city is to pay one-third of the cost of the paving, plus the cost of the intersections, and the front proprietors are to pay the other two-thirds, for which certificates may be issued and recorded as privileges. Included among the plaintiffs are all the front proprietors save two, one of whom sympathizes with them, and the other of whom is a member of the city council.

The contract in question was entered into upon November 23, 1901, and calls for American cement, with stone, and Uvalde Rock asphalt. It contains, among others, the following specifications, to wit:

"Subgrade shall be thoroughly rolled, or tamped, with a roller weighing not less than five tons. Should such rolling or tamping develop any soft or spongy ground, the same shall be removed and such excavations or depressions as may appear shall be refilled with suitable material and the entire subgrade brought to an even and compact surface by rolling or tamping.

\*    \*    \*    \*    \*    \*    \*

"On the subgrade, as above prepared, there shall be placed a layer of American cement concrete of not less than six inches in thickness when tamped. The concrete to be formed and placed as follows:

"The concrete shall be composed of one (1) part of hydraulic cement, two (2) parts of sand, and five (5) parts of broken stone; these proportions to be established by measurement. The cement used shall be fresh, fine ground, hydraulic cement, and capable of withstanding a tensile strain of 125 pounds per square inch, when mixed pure and after an exposure of twenty four hours in air and

six days in water. The cement shall be tested and accepted by the City Engineer and Paving Committee. A cement will not be accepted that cracks or checks when made into thin cakes, or, when made into stiff mortar, sets hard enough in thirty minutes to bear a weight of one pound on a wire one twenty fourth of an inch in diameter. The contractor shall provide dry storage for the cement, and any condemned cement and any that may become damaged shall be immediately removed from the work.

\*    \*    \*    \*    \*    \*    \*

"Portland Cement. This cement shall be of the best quality. It shall have a tensile strength of at least four hundred pounds to the square inch, when mixed neat, when exposed one day in air and six days in water.

\*    \*    \*    \*    \*    \*    \*

"If Portland cement is used, the proportion to be as follows: one of cement, three of sand, and seven of stone, brick, or gravel. \*    \*    \*

"The sand shall be clean, coarse, sharp sand, free from loam or dirt, and shall be screened when deemed necessary by the engineer.

\*    \*    \*    \*    \*    \*    \*

"The stone shall be hard lime stone, or its equal, and vitrified brick and clean washed gravel, broken so as to pass through a two and a half inch ring in their greatest dimensions. They shall be clean from dust or dirt and shall be thoroughly wet before being used.

"The concrete shall be prepared in suitable boxes, and shall be formed by, first, thoroughly mixing the proper proportions of cement and sand together, dry, to which only a sufficient amount of water shall be added to produce a mortar of proper consistency when thoroughly worked. To this fresh mortar, the proper proportion of wet stone shall be added and the mortar quickly and thoroughly mixed until each stone is completely covered with mortar.

\*    \*    \*    \*    \*    \*    \*

"Specifications for Uvalde Natural Rock Cement.

\*    \*    \*    \*    \*    \*    \*

"No binder will be required if this material is used, but care must be taken to leave the top surface of the concrete of sufficient roughness to contain a good bond.

\*    \*    \*    \*    \*    \*    \*

"The entire surface must be thoroughly tamped with hand tampers and then gone over with smoothing irons till it presents a glossy surface. Dry hydraulic cement will then be swept over the top and the surface rolled with a steam roller weighing not less than six tons. The rolling will be first done longitudinally and then transversely at an angle of 45 degrees from both sides of the street and continued until the pavement has been thoroughly compressed. Great care must be exercised in making a proper bond with the surface which has been already laid and allowed to cool.

\*    \*    \*    \*    \*    \*    \*

"The first party shall commence work at such points as the Engineer and Paving Committee shall direct and shall conform to their directions as to the order of time in which the different parts of the work shall be done as well as to all other instructions as to the mode of doing the same.

\*    \*    \*    \*    \*    \*    \*

"The first party shall, upon their being directed by the engineer, remove, rebuild, or make good, at his own cost, any work which the latter shall decide to be defective, and any omission to condemn any work at the time of its construction shall not be construed as an acceptance of any defective work, but the first party shall correct any imperfect work whenever discovered, before final acceptance of the work."

The work was begun on December 2, 1901, and was completed in February, or perhaps early in March, 1902, the officers representing the city in its supervision being the chairman of the paving committee, the city engineer, and an inspector. Of these the two former visited the scene of operations at intervals, though frequently, whilst the latter was employed for that particular job, and was there almost all the time. Various complaints were made to these officers, by citizens who were interested in the matter, as to the quality of the material which was being used, and as to the manner in which the work was being done, but with no satisfactory result; and finally, upon February 12, 1902, four of the plaintiffs now before the

court addressed a communication to the comptroller of the city, notifying him that the concrete had not been put down according to the contract, and that they would decline to pay their pro rata of the cost. This communication was submitted to the city council, with the result that a resolution was adopted directing the paving committee to select three experts, who, with the city engineer, should be instructed to examine the work complained of and report upon the same. And at a meeting of the council held February 27, 1902, a report was submitted, in which the experts say:

"After examining said concrete, we find some of it very soft, considering the length of time it has been laid, but the cement used on this work, being Ft. Scott cement, which, under the best conditions, hardens very slowly, and knowing the nature of the cement used, our past experience would lead us to believe that should the concrete have been made properly, of the proportions specified, the concrete should show a firmer set at the present. We think it would be well to examine this concrete again in about sixty or seventy days, and after that length of time we would be able to make a more accurate report, owing to the peculiar nature of this cement. We have seen this cement used in concrete, and, after being laid one or two years, in all cases it was very hard after that time."

There was also submitted to the council at that meeting a petition bearing the signatures of some 28 citizens, charging that the work, as done, was defective in the respects stated in the petition, and asking that further action be postponed, in order that an investigation might be made, and thereupon a resolution was adopted "that the city council postpone the question of the acceptance of the paving on Sprague street for a period of sixty days, and that the charges brought by the citizens on that street be fully investigated before the paving is accepted."

Following this, at a meeting of the council on March 6th, the attorney representing the paving company appeared and asked for a settlement of its bill, and the matter was referred to the paving committee and committee on claims, with instructions to report at an adjourned meeting, the understanding being that the council had reconsidered its previous action in granting to the citizens the delay for investigation. It was determined, however, that before taking final action the mayor, the chairman of the paving committee, and some other city officers should make an examination of the work, and that the complaining citizens, or some of them, should be invited to participate; and this examination was made upon March 13, 1902, the day of, and immediately preceding, the filing of this suit, with the result, as is conceded, that the city officials decided to accept the work forthwith, and the citizens obtained the injunction in order to prevent their so doing.

The city engineer had in the meanwhile (upon March 10th) submitted a report to the paving committee, from which we make the following excerpt:

"Concreting. Under this head I will respectfully state that all rock, sand, and cement used was in strict conformity to the specifications, and that the proportions were strictly adhered to in mixing the several materials. I was on the ground a good deal of the time, and during my observations I never saw anything wrong or crooked going on. This part of the work was, however, under the special supervision of Mr. H. P. White, inspector, who was on the work at all hours. My attention was called to the fact that the sand was not what it should be. In reference to this I will state that I examined it, and never could find anything wrong whatever with the sand that would in any way effect the durability of the concrete. Taking this class of work and its quality, I conscientiously say that it was done in the same manner that all other work has been done in the city."

Examined as a witness on behalf of defendants, the engineer undertakes to stand by this report, although out of 48 witnesses examined in the case he is the only one who ventures to go that far.

Briggs, the president of the company, does not pretend that all the rock was broken into pieces small enough to go through the ring, nor does he undertake to give the proportion that was so broken. He testifies, in substance, that the contract never so intended; that, unless the rock is much larger or much smaller than the size indicated by the reference to the ring, the durability of the concrete is not affected, and that "they make those

specifications that way to keep out smaller rock just the same as they do larger rock."

Nelson, the vice president, who had charge of the work, testifies that as the rock came from the crusher probably 25 per cent. of it was in pieces too large to go through the ring, and that he had men to break it with hammers; but he does not give the proportion that went into the concrete without being so broken. Severance, the foreman, testifies that it was about 2 per cent.

Upon the other hand, there is an overwhelming mass of testimony to the effect that from 40 to 75 per cent. of the rock was in pieces larger than are called for by the specifications, and this testimony is corroborated by a quantity of the broken rock, some of which was actually taken from the concrete, brought to this court as an exhibit.

The sand used was obtained from a bar, of which Fisher Hopkins appears to be the proprietor, situated in Red river, opposite to or near Shreveport; the method of obtaining it (practicable only when the water leaves the bar uncovered) being to dig it up with shovels and cart it away. The owner of the bar concedes that it contains more or less of loam, but he says that this is true of all sand. The city engineer says in his testimony, "You can't get any sand that hasn't got more or less loam in it;" and his cross-examination then proceeds as follows: "Q. The specifications say that the sand shall be sharp and coarse, free from loam and dirt? A. To my knowledge, yes. Q. Do you, as city engineer, say it had no loam in it? A. I couldn't find any. Q. You couldn't say it had no dirt in it? A. I couldn't find any."

John F. Wise, who, whilst this work was going on, was street commissioner, an office which he had held for six years, and who became a member of the city council after the institution of this suit, testifies that whilst acting as inspector for work of a similar character, which had previously been done on Texas street, he refused to permit the Fisher Hopkins sand to be used, and, upon seeing that it had been collected to be used on Sprague street, he called the attention of the then inspector, White, to it, and showed him that it was unfit, by reason of an undue amount of loam or dirt in it, to be used in making concrete. The following is a portion of his testimony:

"Q. How did you test the sand? A. I just got down and picked up a handful at a time. It is the best way to test sand. If there is loam, or anything in it, it sticks up in a lump. Q. And you closed your hand together on the sand? A. Yes, when you pick up a handful. Loam is clay joined; it is not sand itself. The sand leaves a piece of loam, what you might observe as a clay joint; it is in lumps. Q. When you would close your hand together, would a lump of that loam be left? A. Yes, if you work your hand, and the sand would sift out."

Other witnesses examined and tested the sand, and reached the same conclusion.

The cement was brought from Ft. Scott, Kan. (with the exception of some Portland cement, which was used upon about a square and a quarter of the work), and there was considerable discussion between the chairman of the paving committee and some of the citizens as to whether it had the strength called for by the contract. Tests were made at various times, but the results were unsatisfactory. Finally, Thomas, the manager of the Ft. Scott cement business, and an avowed expert in the manipulation of cement, appeared upon the scene, and undertook to test certain samples, which were furnished as being of the kind in use by the intervener. One of the samples, called the "Market House Cement," from the fact that it was brought to him from a vault in the market house, is said to have withstood a strain of from 132 to 145 pounds, but the plaintiffs throw some doubt upon the origin and character of the sample. Another sample, obtained from the inspector, White, was made up into twelve "brickets," which were broken, respectively, under the following strains (in pounds), viz., 85, 80, 95, 92, 94, 78, 13, 99, 102, 60, 140. The defendants and the intervener, however, say that this sample had probably been unduly exposed to the weather, whilst with regard to the bricket which withstood the strain of 140 pounds, it is said by the plaintiffs that the testing apparatus was out of order, and did not work properly. And similar controversies exist with regard to the other tests. Nothing very definite can therefore be said to have resulted from any of them. It, however, appears that the "wire" test was never successfully made; Mr. Thomas, whose atten-

tion was called to the fact that it was required by the specifications, saying that it was "obsolete." It further appears that in the opinion of the intervener and of the people who handle the article, if, in twelve "brickets" made of the same brand of cement one can be found which, under the most favorable conditions, stands the strain called for by the specifications, the obligations of the contract are fulfilled. Upon this subject the city engineer made the following explanation to the jury:

"If the lowest test was taken into consideration, it would be on the same principle that you would test a race horse. If you take a race horse out on the track, and say, for instance, the first heat he ran would be 1.15, and the next heat, he runs it in 2.20, and the next time, he runs it in 1.10, he has run three heats, and you take the average, you wouldn't suppose that that was as fast as he could go. Q. How would you class him? A. I don't know. Q. Would you class him at his lowest or his highest speed? A. I would class him on his lowest. Q. The shortest time? A. Yes, sir; 1.10."

Thomas testified substantially to the same effect, and he also testified that the results to be obtained in testing cement depend largely upon the skill of the expert who does the work, and that a person who has not been properly instructed is incompetent to make a fair test or to obtain the best results.

Concerning the proportions and the manner in which the three ingredients, the cement, the sand, and the rock, were mixed, Levi Cochran, a negro man, who was the "captain" of the mixing boards, was sworn on behalf of the plaintiffs, and testifies in part as follows:

"Q. What instructions were given you about the mixing of the concrete? A. When I first went to work on Sprague street, I said, 'Well, what is the mixtries?' He (referring to the foreman, Severance) said, 'Well, the mixture will be, over there, 1, 2, and 8.' When he started to work, he says, 'Now, I want you to get in just as much rock as you possibly can.' Q. What do you mean by 1, 2, and 8? A. One big barrow of cement and three big barrows of sand. Q. The proportions were how much? A. 1, 3, and 8. A. Well, you just said 1, 2, and 8. Do you say it was 1, 3, and 8? A. 1, 3, and

8. Q. Who gave you those proportions? A. Mr. Harry Severance. Q. What do you mean by 1, 3, and 8? A. A barrow of cement and three barrows of sand. Q. How much rock? A. Eight barrows of rock. I just dumped the sacks of cement on the board. Q. How many sacks of cement did you dump on the board in mixing it? A. Two sacks of cement, three barrows of sand, and 9 or 10 barrows of rock in that much sand and cement. Q. Then mix it up? A. Yes, sir. We would mix the dry mixture first, you know, and then wet it, and then put the rock on, and put from 9 to 11 barrows of rock. Q. How much cement does one of your big rock barrows hold? A. Two. Q. When you put two sacks of cement on the board, it is the same as putting one big rock barrow of cement? A. Yes, sir. Q. Then you put how many barrows of sand? A. Three. * * * Q. Well, now, what about Mr. White, the inspector for the city, there? A. Well, Mr. White would be for the right, I suppose. He would be around and jack me up once in a while, and would holler and get mad, and I would go and get Mr. Harry Severance. Q. What would become of the contest between you and Mr. White? A. Well, when he would jump on me, I told him he ought to go and tell Mr. Harry about it. I was under his orders, and when he would curse me so, and I would go to Mr. Harry, why, then Mr. Harry would jump on me, and curse me, and then, when Mr. White would go off, he would say, 'That's all right; go on like you are doing.' Q. He would abuse you before Mr. White's face? A. Yes, sir. Q. And when Mr. White would go away, he would tell you to go on and do it as you had done before? A. Yes, sir; go ahead like before. Q. What would you do with those boards? A. I would go ahead with them just the same as I had done. * * * Q. Was Mr. White there all the time on the work? A. Well, he would be there, but he would sometimes have his back turned to me. Q. When he would have his back turned to you, what would you do? A. Just as soon as I would see the rock barrows loaded, I would call for rock. Q. You mean that you would call for the man to roll the rock barrow on the board? A. Yes, sir. Q. What was your object in doing that? A. Because I had orders to. Q. From whom? A. Harry Severance.

Q. To put in all the rock you could? A. Yes, sir. Q. What was the highest number of barrows of rock you ever put in on the street? A. The most I put in was 14 barrows. Q. Did Mr. White make any kick there about that. A. Yes, sir. He would make a kick, it looked so bad behind us, I would throw what we call 'grout.' Q. You would mix up some cement and water and throw over this concrete you had laid down, and you call this mixture you throw over it 'grout'? A. Yes, sir. * * * Q. What about the dinner hour, there, now—whether or not he would get back from his dinner at the time you would commence? A. We would always be at work when he would get back. Q. Sometimes, how long would you be at work? A. Well, I don't know. Sometimes he would come back and I didn't see him, and Mr. Harry Severance would have his handkerchief down in his hand that way, and I would look around. Q. Well, Mr. Severance would give you that signal for what? A. To look out, Mr. White was coming."

In juxtaposition to this we place the following excerpt from the testimony of Severance, the foreman:

"Q. Now, about what time did you begin the Sprague street work? A. The Sprague street we began in December. * * * Q. What were the mixtures for that concrete work? A. The mixtures were 1, 3, and 8. Q. What were the specifications, do you remember? A. Well, it was just double the amount we used; that is, we used double the amount specified, because we tried to make double batch. * * * Q. What was the character of the work you did there? A. First-class work, according to the specifications, and a great deal better than the specifications called for. Q. In what way? A. Why, in this way: taking three sacks of cement—we used three sacks of cement—the cement was never dumped on the board. There was always three sacks of cement on the wheelbarrow, and they were wheeled on there. That was a quarter of a barrow of cement more than the specifications called for. The specifications called for one, three, and eight, according to the way we mixed it, by measurement in the wheelbarrows, taking the wheelbarrows all the same size, and we cut out one barrow of rock in every

110 LA.—34

batch. Q. In other words, according to the proportions mixed, you added one barrow of rock less every time than the specifications called for? A. Yes, sir. Q. Do two sacks of cement make a wheelbarrow? A. Yes, sir; you can hardly get on two sacks. It wouldn't lay on, and that was the reason we kept it in the sack. Q. Do you know Levi Cochran? A. Yes, sir. Q. What was his position with you? A. He was one of the captains of the concrete gang. Q. Well, you spoke of one. What do you mean? A. Well, there was a captain for each board. Q. You had how many boards? A. Four boards. Q. He was captain of one of them? A. Yes, sir; one of the captains. Q. Well, Mr. Severance, did you ever say to him or give him instructions to run in just as much or as many barrows of rock in the sand and cement as he could? A. No, sir. Q. What chance would he have had to run in 9 or 11 barrows of rock, instead of the smaller quantity called for, without your detecting it? A. Well, he would have had no possible chance, for two reasons: One, that if he had done so, and I had caught him at it, I would have fired him; and the next is that the board would not have held it. The concrete board that we had for measuring would not stand that kind of measurement. Q. How many wheelbarrows did you use on the work? A. We used, 7 and 3, is 10, and then what was necessary to wheel the cement in. * * * Q. Did you ever tell him, after Mr. White had gone away, to go on and perpetrate a fraud—go on and do like he was doing it? A. No. sir. Q. Did you ever tell him to perpetrate a fraud on the city in any way? A. No, sir. Q. Had you any interest in this job other than your salary? A. Yes, sir. Q. Well, then, what interest is there, if any, by which you would have any further interest in it? A. Why, a future. Q. What about the future? A. Well, I had a future. I wanted to do a good piece of work. It was to my interest to live up to the specifications. Q. Well, did you have a financial interest in the outcome of the job? A. Yes, sir. Q. What was it, Mr. Severance? A. Well, it was a small percentage in regard to the work. Q. Well, then, Cochran said that after Mr. White would go away he would go on just the same as he had been doing. Now, would Mr. White ever go away, so that

110 LOUISIANA REPORTS.

you could go on perpetrating any fraud? A. No, sir; Mr. White was always on the work. Q. He said his object in doing it was because he was under orders from you to do it. You say you never gave him any such orders? A. I never gave him any such orders. Q. He said that it would look so badly that he would throw on grout. What do you know of that being done, and of the reason for it, if any? A. Well, it has always been my object, in laying rough concrete, so that the asphalt will bind. There was some places where the concrete was a little rough, but that occurs in every job. Q. Then he said that when Mr. White would get away you would give him a handkerchief sign to go ahead and dump in more rock than was required. Did you ever give him any such sign as that? A. No, sir."

Thus far the witness appears to have been examined by the counsel representing the paving company. He is now taken in charge by the counsel for the city, and the examination proceeds:

"Q. You stated that you started to work on the west end of this street, beginning at the bottom of the slope and working up towards Western avenue? A. Yes, sir. Q. On that part of the work you used Portland cement? A. Yes, sir. Q. On account of the Ft. Scott cement not having arrived? A. Yes, sir. Q. You used it at that point for that reason? A. Yes, sir. Q. And you stated that you mixed it 1, 3, and 8? A. Yes, sir. Q. The specifications were 1, 2, and 5. How do you explain that? How do you reconcile your statement? (Objected to by counsel for plaintiffs as not being fair to the plaintiffs, now, to * * *.) A. You remember I have a claim in there about the measurement in the wheelbarrow. I was not answering according to the specifications. Q. Well, I will just ask you the question now, were the specifications 1, 2, and 5? (This question is objected to by counsel for plaintiffs for the reason * * *.)

"Q. Now you say that you measured it? (Objected to by counsel for plaintiffs.)

"Q. Now, Mr. Severance, do you know what the city specifications were? (Counsel for plaintiffs objected to the counsel for the defendant telling the witness what the specifications in the contract were, as he did while counsel were attempting to make their objection to the court and were on their feet addressing the court for that purpose. Objection sustained.)

"Q. Mr. Severance, do you know what the city specifications were? A. Yes, sir. Q. Now, I will ask you to reconcile your statements with the city specifications? (Objected to by counsel for plaintiffs.) Q. Is this the city specifications? here is the contract with the Nelson Paving Company? (Objected to by counsel for plaintiffs.) Q. Is this the city specifications? A. Yes, sir. (Counsel for plaintiffs object to counsel for defendant offering the witness on the stand the specifications for the contract for the paving of Sprague street and pointing out to the witness the clause in the specifications fixing the proportions of the cement, the sand, and the rock called for in the specifications as called for in the contract, and his previous statement before the jury that the specifications were 1, 3, and 8. Objection overruled. To which ruling of the court counsel for plaintiffs except, and reserve this note in lieu of a formal bill of exceptions.) Q. Is that the specifications of the contract between the city and the Nelson Paving Company? A. Yes, sir. Q. Well, what do the specifications say as to the proportions? A. As to the proportions—1, 2, and 5. Q. I want you to state to the jury whether or not those proportions were in fact followed? (Objected to by counsel for plaintiffs as leading, and ask that the question be stricken out.) Q. In what respect does the mixture, as you made it on Sprague street, differ from the proportions as called for in the specifications? A. In nothing. Q. Please explain to the jury why it is that they do not differ? A. Well, we will start on the cement. The barrows that we were using were all the same size, and we put three sacks of cement on a wheelbarrow. It takes two sacks to fill the wheelbarrow, and we wanted to make a double batch, and we put on the third sack to make as near a double batch as we could, so we used three barrows of sand, three sacks of cement, and eight barrows of rock—well, we used seven barrows of rock. Q. So, in the way in which you applied it, you put in three sacks of cement, which was more than a barrow? A. Yes, sir. Q. So that in mixing it you mixed it, 1, 3, and 7, and, strictly speaking, you could have used eight bar-

rows of rock? A. Yes, sir, and make these proportions. * * * Q. This man, Levi Cochran, you know, of course, is he in town here yet? A. Yes, sir. I saw him yesterday morning. He is here. He is looking for a job. I am going to give him a job. He is going to work for me on the telephone. * * *" Cross-examined: "Q. You are willing to give him a job, notwithstanding the statements he has made on this trial here about that concrete, it seems? A. I will give him a job until this trial is over; yes, sir. Q. The job is going to last until this trial is over? A. I have not talked to him personally. Q. Yes, you have not talked with him personally? A. No, he wouldn't talk to me now. Q. Were you under instructions to give him a job? A. No. I am under no instructions. Q. You are going to give him a job? A. He is a pretty good man. Q. You always found him a good man? A. I found him a first-class man. Q. Mr. Nelson always found him so? A. I think so. * * * Q. You vouch for him now as a first-class man? A. I do. * * *" Re-examined: "Q. Considering that Levi Cochran testified in this case that you and he entered into a conspiracy and actually did perpetrate a fraud on this city and on Mr. White, as the inspector, and you say that he is a first-class man. What do you mean by that? A. I have my reasons. That is to say, I want Mr. Cochran to stay right here until after this suit is tried. Q. Well, what do you mean by first-class man? A. He is a first-class workman, is what I mean. Q. You don't mean from a moral standpoint? A. No, sir. Q. You mean to say that these things that have been read out to you that he has testified to are false? A. Yes, sir; and I will prove so after a while. Q. You testify, then, that when you say he is a first-class man that he is a good workman? A. He has worked for me since 1896, and he is a first-class workman. I learned him to lay concrete."

The witness elsewhere contradicts or explains his statement that Cochran was captain of one of the boards by saying that he had charge of the wet mixing on all four boards, and he undertakes to modify or explain his testimony to the effect that he had a "percentage" interest in the work as follows:

"Q. Well, Mr. Severance, you say you had an interest in this contract for paving Sprague street—just a small interest? A. Yes, sir. Q. And you were also getting a percentage on the profits? A. No, sir. Q. What was your interest then? A. Good faith. Q. You said a while ago you had a small percentage? A. I did. Q. What did you mean by a small percentage? A. Mr. Nelson was out of the state a great deal, and, of course, I had charge of the work, and my salary was raised to carry it on, and to attend to my work properly. Q. What do you mean by 'percentage'? You don't mean to say that daily wages is percentage? A. Yes, sir. Q. You call your daily wages a percentage? A. Yes, sir; that is you get an increase of salary. Q. What was your increase based on? Was it based on the amount they made on the contract? A. No, sir. Q. What was it based on? What was the basis of your increase in salary? A. The basis of increase of salary means that if you take care and handle your work properly, take an interest, you get an increase of salary, and that is the percentage that I claim I had, or was due me, when the job was finished. I went to Waco and settled up, and from that time had no more to do with it."

The inspector, White (examined as a witness for the defense), upon March 10th, in anticipation of the acceptance of the work by the city authorities, signed a certificate, prepared by the chairman of the paving committee, similar to that given by the city engineer. He, however, gives the following, with other testimony:

"Q. Probably some rocks got in that were larger size than required by the strict letter of the law. What have you to say about that? A. It would be a hard matter to keep them all out. They were making a double batch, and running two boards, and it was a hard matter to see every rock that went in, and they would have about ten barrows of rock on each board, and it would be a hard matter to see every rock that went in. One was liable to slip in and a man not see it. * * * Q. To what extent would it be practicable for any number of watchers to prevent any number of rocks from getting in over 2½ inches in size? A. I would think there would have to be a man on each board. Q. Do you think they could keep them all out? A. No, sir. * * * Q. What kind of

sand did you use? A. Bar sand. Q. It had more or less loam in it? A. Yes, sir, some loam in it. Q. Don't you know your specifications said it should be clear of loam? A. Well, there was some loam in it. * * * Q. Don't you recollect, in that connection [referring to a complaint said to have been made by one of the plaintiffs as to the manner in which the concrete was mixed] saying to Mr. Sewall that you had made a complaint to the concrete foreman? A. No, sir; I do not think I could possibly have said such a thing, because I had had several difficulties with the men about the way they were mixing it, and turned one man off the board entirely. Q. For his bad work? A. Yes, sir. Q. You don't remember saying to Mr. Sewall that you had complained to the concrete foreman, and you were having it done the best you could get them to do it? A. I do not. Q. Can you say that you did not say that? A. I do not think I did, though I may. Q. But you don't remember saying it? A. No, sir. Q. Could you say now that you could not say it? A. Well, I don't remember. I don't say positively but what maybe I did, though I don't think I ever said such words; that I couldn't have it done, because when I started after them they did it as I told them. Q. You said the concrete foreman was overbearing? A. He was. Q. To you? A. Yes. Q. How? A. He didn't want to pay much attention to what I said. Q. You would complain to him, and want him to do different from what they were doing, and he wouldn't pay much attention to you? A. He did not. Q. Was he rude to you? A. No, he was not rude. Q. How do you mean that he was overbearing? A. He tried to have his own way. Q. And you wanted to have your way? A. I did have it. Q. You had a great deal of trouble with him? A. Yes. * * * Q. I will read your testimony to you: 'The foreman of the board was very overbearing. I went to him very often about the way he was going on, and I went to see Mr. Nelson.' Is that your testimony? A. I think it is. Q. I will ask you, Mr. White, if Mr. Quiggles did not call your attention to the way the concrete was being mixed, and tell you that it was not being properly mixed? A. I really don't know whether he did or not. Such a thing was call [sic] to me by several parties, but I didn't think that they

knew my business. I thought I knew my business myself. Q. Mr. Quiggles was formerly a city councilman, was he not? A. Not at that time. Q. I don't mean at that time, but formerly? A. Yes, sir."

Mr. Quiggles testifies as follows:

"Q. You are not one of the plaintiffs and abutters, I don't [sic] believe? A. No, sir. Q. Did you tell Mr. White, early in the work, that the mixing was not being properly done? A. Yes, sir. Q. Did he then say something to Mr. Severance about it? A. He spoke to the foreman, or Mr. Nelson, I don't know which, and he came on over there, and was told that he was bossing the job. Q. In what way—in an ironical way? A. Yes, sir. Q. You say the answer by Mr. Severance or Mr. Nelson was in a very short way? A. Yes, sir. Q. What did they say to him? A. I didn't exactly hear what it was at the time, but it was a very short answer, and he was told that he was bossing the job. * * * Q. You told Mr. Agurs [chairman of the paving committee] that they were not mixing it properly? A. Yes, sir. Q. What did he say? A. Well, he said that it was according to the U. S. government specifications, the way they were putting it in there. Well, I told him it might be, but that I was satisfied that the government didn't mix concrete that way. Q. He didn't go to Mr. Severance and Mr. Nelson and make complaints, did he? A. No, sir. * * * Q. Do you know how to mix concrete? A. Well, I have seen it mixed often enough. * * * Q. Well, how do you mix concrete? A. Well, I would have my board level—that is one thing they didn't have— and I would pour the sand and cement on there and mix it thoroughly, and wet it down as we throw it on. I wouldn't have too much water. I would keep getting enough water and would mix it so that the sand and cement wouldn't run off the board. I would fix it so that the sand and cement would stick to the rock. Now, if you want to know how they mixed it, I can tell you how they mixed it. Q. Tell us how they mixed it, then. A. Well, their board was not level, and they scattered the sand out, and put the cement on top of the sand, and had some barrels and buckets, and they just dashed the water on it until they got it almost in a liquid form, and a great deal of it

run off the board, and then they would get in a dash of rock, and throw it over it, and they took the hose and filled it on top of the rock, and some of the rock didn't have any cement or sand on it at all, and somebody complained about the rock not [?] being dry, and then, to make it wet, they would take from one to two or three buckets of water and pour it on top of the rock, and that would wash the sand and cement off that had stuck on them, and then they would take their shovels and throw it on the street."

Nelson, the vice president of the paving company, testifies that two sacks of cement would fill a barrow quite full, but that they nevertheless put in three sacks to make a batch and a half at a time. He also testifies that the concrete was laid four or six weeks before the asphalt was put on. Beyond this, the evidence is conclusive to the effect that up to the time this suit was filed (although the pavement was completed and the city was about to accept it, pay its proportion of the cost, and impose upon the property of the front proprietors a lien for the balance) the concrete, with the exception of that portion which had been made of Portland cement, was still wet and soft, and that the hot asphalt, having been laid on it whilst in that condition, had formed no bond whatever. It is further shown that there are waves upon the surface of the street; that since the trial began the concrete has entirely given way in some places (part of which the defendants attribute to tunneling in the laying of pipes), and that instances have occurred in which the asphalt has been raised from the surface of the concrete by water which found its way between them. No doubt there was considerable drying and hardening of the concrete during the six months which elapsed between the date at which this suit was filed and the date upon which it was last on trial. But even at this time, judging from the perfectly dry specimens filed as exhibits in this court, and comparing them with the specimens made of Portland cement so filed, it is at best an inferior article.

## Opinion.

To the assertion of the plaintiffs that the contract has not been complied with because, in the making of the concrete, the specifications with reference to the size of the rock and the quality of the sand were not observed, the defendants and the intervener answer that the specifications are not to be given the only meaning of which the language used is susceptible, as in that case it would be difficult to comply with them, but that they should be held to be sufficiently complied with if the result, as a whole, is reasonably up to the standard of work as ordinarily done under contracts of a like character. This is not a sound proposition, since the purpose of the written contract and of the specifications is to fix with certainty the obligations of the parties, and thereby obtain definite results. It is said that the specifications are similar to those used by the United States government. If this be true, it is fair to assume that they are the results of an intelligent consideration of the subject, and that broken rock of the size and sand of the quality specified are more suitable for the purpose contemplated than broken rock of another size and sand of another quality. But, even if this were not so, it was competent for the parties thereto to make the contract as they did, and the one has no right to ignore, because difficult of fulfillment, conditions which the other has not waived. Assuming, for the sake of argument, that it is not of the essence of the contract here in question that the contractor should comply strictly with any particular condition, nevertheless, if it appears that the cumulative effect of its noncompliance with several of the conditions is the laying of a pavement inferior in quality to that contemplated, it is clear that the contract has not been executed on the one side, and should not be enforced against the other, since it is certainly of its essence that a pavement should be laid that will be as strong and as durable as can be laid by means of the combination of materials and method called for by the specifications.

Pretermitting the question of the size of the rock and the quality of the sand, regarded as independent factors, we may proceed to the consideration of the manner and the proportions in which those ingredients were combined with the cement, and the general result.

If the testimony of the witness Cochran is to be believed, a deliberate fraud was perpe-

trated in the making of the combination referred to, and the result is a pavement necessarily inferior to that called for by the contract under which it was laid; and, whether that testimony be considered apart from other testimony and from the indisputable facts, or in connection therewith, we find no sufficient reason for disbelieving it. It is true that the man is a negro, but he had been working for and with the contractor or its officers since 1896, had parted with them in perfect amity, was vouched for, even after he had testified, as a first-class workman, and (until Severance had been cross-examined by the counsel by whom he was put on the stand) as a first-class man. More than that, Severance testified that he intended to employ him in the future. It is shown also that Cochran wrote to Nelson for a letter of recommendation, and that Nelson authorized his secretary to send it to him, and such a letter, purporting to have been written by Nelson, was produced on the trial, but because Nelson denied the signature it has been suggested that Cochran had forged it. This suggestion has but little apparent foundation in reason or probability. Why should he have forged an instrument which he could have obtained without forgery? And why should he voluntarily and unnecessarily have produced it as genuine in a case in which he was testifying adversely to the interest of the person whom he named as the author? The answer would seem to be that, as he had written to Nelson for the letter, and as Nelson had authorized his secretary to write it, the latter had done so. And there is nothing to the contrary in the record beyond the statement made by Severance to the effect that the handwriting resembled that of Cochran. The testimony of Severance does not, however, commend itself very highly even in those matters concerning which he may be supposed to have some knowledge, and is worth less than nothing in this instance, since it is not pretended that he is an expert in handwriting. It was developed on the trial that after the Sprague street job had been completed Cochran had gone to Texas, but that he had returned to Shreveport, and at the time that he gave his testimony was employed in a store of which one of the plaintiffs is the proprietor. It is reasonable, therefore, to suppose that the plaintiffs knew what he would be likely to testify to before they put him on the stand, and it is not unlikely that he was given employment in order to keep him in Shreveport until his testimony should have been given. These circumstances do not, however, destroy his credibility. And a question which suggests itself is, considering that the character of the materials handled by him, and the manner in which he did his work, promised to be vital issues in the case, why did the defendants and the contractor leave it to the plaintiffs to produce him as a witness? As the matter stands, even if his general credibility had been overwhelmingly impeached, the fact remains that he was nevertheless capable of telling the truth, and with respect to the particular things concerning which he has testified the corroboration which he has received leads us to believe that he has done so. It will be remembered that he asked about the "mixtries" he was told that they were 1, 3, and 8—i. e., one of cement, three of sand, and eight of rock; and it will also be remembered that when Severance was interrogated upon the same subject—i. e., as to what mixture was called for by the specifications—he gave the same answer, and it is to be observed that he was never thereafter allowed to hazard another statement concerning the specifications until they were placed in his hands, and the particular paragraph referring to them had been pointed out to him, after which he undertook an elaborate explanation, in which he was supported by Nelson or Briggs, and possibly both, to the effect that their custom was to make a batch and a half of the concrete instead of a single batch, and that, in order to do so, three sacks of cement were put on a barrow (which, according to their own testimony, would hold but two), and the sand and rock were then added in the proportions called for by the contract. It will further be remembered, however, that neither Briggs, Nelson, nor Severance mixed the concrete, or spent their time at the mixing boards. Cochran was the man to whom that duty was assigned. He alone was in a position to know exactly what was done, and his account of it, showing that all was not well so far as the interests of the city and of the property holders were concerned, is corroborated by the reluctant testimony of White, by the tes-

timony of other witnesses, and by the fact that a concrete (if that name can be properly applied to it) was produced, which, weeks, if not months, after it had been laid, could be broken up by hand, or at least with the heel of a boot, and which is indifferently characterized by the witnesses as "soft," as "miserable, abominable, rotten," and as "dough." And for the rest it is shown that upon this composition—cold, wet, and soft—the hot asphalt was spread and rolled, with the result that it became necessary to put probably 200 patches upon the surface of the street before it had ever been used, and water was running in several places between the asphalt and the concrete before the trial of the case was finished in the district court.

Upon the whole, it is a question whether the intervener complied with its contract in any one particular. It is quite certain that the pavement as laid by it is not the pavement that the city and the front proprietors have a right to demand; and citation of authority is hardly necessary for the support of the conclusion that one ought not to be allowed, and the other ought not to be compelled to pay, the contract price.

It is fully conceded that the authority of the judiciary should be interposed in a case of this kind with the utmost circumspection, since, if there be presented a question merely of the wisdom or unwisdom with which a municipal corporation, acting in good faith, is exercising the discretion vested in it by law, the courts have no function to discharge. It is not, however, within the discretion of the defendant corporation to expend public money or to impose obligations upon its taxpayers without consideration, or for a fraudulent consideration, even though it may not be a party to the fraud; and, as any taxpayer may invoke the action of the courts to prevent such an expenditure, a fortiori have the plaintiffs in the instant case the right to invoke such action, since the money claimed by the intervener has not been earned, and the obligation to pay the greater proportion of it would otherwise be imposed upon them. The plea of no cause of action was properly overruled, and has been abandoned, and the plea of estoppel is not sustained by the facts relied on. In conclusion it may be remarked that Sprague street is, no doubt, at this time, in better condition than before the pavement

was laid; but, whether the intervener can recover from the city or the front proprietors upon quantum meruit, or can still do the work called for by the contract, are questions concerning which we express no opinion. It is quite certain that it is not entitled to recover under the contract as matters now stand, and the city should be prohibited from accepting the work.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiffs, perpetuating the injunction herein issued, the defendants to pay the costs incurred prior to the filing of the intervention, and the intervener to pay all costs thereafter incurred, including those of the appeal.

BLANCHARD, J., takes no part.